**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
<u>Norfolk Division</u>

|  |  |  |
|---|---|---|
| COMMERCIAL METALS COMPANY, | ) | |
| *d/b/a* CMC DALLAS TRADING, | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No.: 2:09cv451 |
|  | ) | |
| COMPANIA ESPANOLA de | ) | |
| LAMINACION S.L., | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**
**FOR INSUFFICIENT SERVICE AND LACK OF PERSONAL**
<u>**JURISDICTION BY COMPAÑIA ESPAÑOLA DE LAMINACIÕN S.L.**</u>

Plaintiff Commercial Metals Company, d/b/a CMC Dallas Trading ("CMC"), by counsel, submits this Memorandum in Opposition to Motion to Dismiss for Insufficient Service and Lack of Personal Jurisdiction (the "Motion to Dismiss") by Compañia Española De Laminación S.L. ("Celsa").

As explained below, the Motion to Dismiss For Insufficient Service of Process should be denied because:  (1) Celsa's agent, Marc Grau Mancebo ("Grau") was properly served in Virginia on September, 15, 2009, and (2) Celsa was properly served a second time pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii).[1]

As explained below, the Motion to Dismiss for Lack of Personal Jurisdiction should be denied for five independent reasons: (1) Celsa consented to the jurisdiction of this Court; (2) Celsa's agent was served with process in Virginia; (3) Celsa contracted to sell millions of dollars worth of steel to be shipped to Virginia; (4) Celsa's fraud caused tortious injury in

---

[1] In Spain, people are given a paternal surname followed by a maternal surname, but are addressed by their paternal surname.  Accordingly, Marc Grau Mancebo will be referred to as Marc Grau, Mr. Grau, or Grau.  Other Spaniards will be referred to in the same manner.

Virginia; and (5) Celsa breached a warranty with respect to goods shipped to Virginia.

## I. Background

This matter is related to litigation already pending in this Court, *Barna Conshipping, S.L., v. 2,000 Metric Tons, More or Less of Abandoned Steel, in rem*, Civil Action No. 2:08-cv-00612 (E.D. Va. filed Dec. 22, 2008) (the "Barna Litigation"). Both cases concern Celsa's sale to CMC of roughly $15,000,000 worth of steel and Celsa's subsequent shipment of that steel from Barcelona, Spain to various ports in the United States by way of Celsa's alter ego, agent, and commonly owned and controlled chartering affiliate, Barna Conshipping, S.L. ("Barna").

The essential facts are these. Celsa, a Spanish company, contracted with CMC, a Delaware Corporation, to sell roughly $20,000,000 worth of steel to be delivered in four separate lots to the ports of Norfolk, Virginia; Mobile, Alabama; Houston, Texas; and Altamira, Mexico.[2] Complaint, ¶¶ 1,3,5,22. The steel was damaged during loading aboard the M/V SATURNUS (the "Vessel") in Barcelona Complaint, ¶ 10. CMC immediately made Celsa aware of the damage. Complaint, ¶¶ 14,15,31. The mate's receipts issued by the master of the Vessel correctly noted the improper loading, stowage, and damage to the steel.[3] Complaint, ¶ 15. Celsa's own surveyor in Barcelona observed and documented the improper loading, stowage, and damage to the steel.[4] At the load port, Naviera Barcelonesa, S.A. was both the agent of the Vessel and the agent of Barna. (Grau, 235:13-17)[5]. Celsa, knowing the steel was damaged,

---

[2] In actuality, Celsa delivered only about $15,256,408.47 worth of steel. Complaint, ¶ 38.

[3] A mate's receipt is a document signed by an officer of a vessel evidencing receipt of a shipment aboard the vessel and the condition of the shipment.

[4] A copy of the Survey Report dated February 12, 2008, by SGS Española de Control SA is attached as Exhibit 1.

[5] Grau was deposed in the Barna Litigation as Barna's Fed. R. Civ. P. 30(b)(6) witness on September 15 and October 8, 2009. Cited pages of Grau's deposition transcript are attached collectively as Exhibit 2. The transcript will be cited as "(Grau, __:__)."

induced Naviera Barcelonesa, S.A. to issue fifteen "clean" bills of lading that did not accurately reflect the condition of the steel.  Complaint, ¶¶11, 33.   Celsa's interrelationship with Barna who was one of Naviera Barcelonesa, S.A.'s principals made the inducement possible.   But for Celsa's conduct, the bills of lading would have been claused to reflect the condition of the steel and therefore would not have been issued "clean."  Complaint, ¶ 35.  Celsa knowingly used the "clean" bills of lading so it could fraudulently draw under CMC's letter of credit with JP Morgan to obtain payment in the amount of $15,256,408.47.  Complaint, ¶ 38.  Celsa could not have drawn under CMC's letter of credit unless the bills of lading had been issued clean. Complaint, ¶ 37. By November 7, 2008, Barna was aware that Oldendorff Carriers GmbH & Co. KG ("Oldendorff"), the disponent owner of the Vessel, took the position that the bills of lading should not have been released by Naviera Barcelonesa, S.A. and were therefore void.  (Grau, 120:20-121:2).  Nonetheless, despite knowing via direct communication from Oldendorff that Oldendorff considered the bills of lading void, Celsa used one or more of the "clean" bills of lading to draw on the letter of credit.  Complaint, ¶ 39; (Grau, 71:25-72:5).  In fact, Celsa used the bills of lading to collect the majority of the $15,256,408.47 after it had received that notification from Oldendorff.  (Grau, 93:19-94:17).   Celsa had received payment on all the bills of lading by November 18, 2008.   A list of the payments, the confirmation numbers, and payment dates is attached as Exhibit 3.

        In order to induce Oldendorff to change its position and declare the void bills of lading valid, Carlos Castán, an employee of Celsa and not Barna, signed a letter of indemnity on behalf of Barna in favor of the Oldendorff.  In that letter of indemnity, Castán represented that he was the "Logistics and Planning Director of *Barna Conshipping, S.L.*"  The November 19, 2008, letter of indemnity is attached as Exhibit 4 (emphasis added); (Grau, 368:9-369:21).  Castán even

3

used Barna's seal on the document.  Exhibit 4, pg. 3.  That letter of indemnity was signed on November 19, 2008, the day the Vessel arrived in Norfolk, Virginia, and a day after Celsa had received full payment under all fifteen bills of lading. Barna Amended Complaint, ¶ 16;[6]  Exhibit 3.

When Celsa's Spanish bank sought reimbursement under the letter of credit from JP Morgan, JP Morgan initially refused.  Complaint, ¶¶ 44-5.  At that time, JP Morgan possessed the original bills of lading without which, Oldendorff would not allow CMC to take delivery of the steel.  Complaint, ¶ 46.  Despite their ability to do so, Barna and Celsa failed and refused to timely coordinate the discharge of the steel, as a consequence of which the Vessel was delayed. Complaint, ¶ 46.   Instead of coordinating the discharge, Barna and Celsa elected to file Barna's admiralty claims - the Barna Litigation - against the steel seeking to force the offload of the steel and to recover costs as well as claimed detention.  In doing so, Celsa used Barna as its proxy in the United States to file suit and force CMC to take delivery of the damaged steel without Celsa having to make a direct appearance and answer for its fraud and breaches of contract.  After the Barna Litigation began, JP Morgan changed its position determined to honor the letter of credit. Complaint, ¶ 49. CMC then filed suit against JP Morgan in Texas to enjoin payment of the purchase price but was unable to obtain a permanent injunction because the Texas court found that CMC had an adequate remedy at law.[7]   Complaint, ¶ 51.  Barna later amended its suit to include various quasi-contractual claims against CMC.  This Court dismissed Barna's admiralty claims for lack of jurisdiction and failure to state a claim, which Barna has appealed interlocutory to the Fourth Circuit.

---

[6] A copy of the Amended Complaint in the Barna Litigation is attached as <u>Exhibit 5</u>.

[7] The case against JP Morgan was filed in Texas state court and removed to federal court by JP Morgan.

In September 2009, CMC filed this independent action against Celsa seeking to recover its damages for Celsa's breach of contract in the sale of the steel and fraud in obtaining payment. Celsa has moved to dismiss claiming that service was ineffective and that it is not subject to jurisdiction in Virginia. *See generally* Defendant's Memorandum in Support of Motion to Dismiss Pursuant to Rules 12(b)(5) and (b)(2) (hereinafter, "Celsa's Brief"). As explained below, Celsa is wrong. Service was effective and Celsa is subject to the jurisdiction of this Court. Accordingly, the Motion to Dismiss should be denied.

## II.  Standard of Review.

Service of process is generally regarded as a matter discrete from a court's jurisdiction and its core function is to supply notice of the pendency of legal action. *Henderson v. United States*, 517 U.S. 654 (1996). The "district court enjoys a broad discretion in determining whether to dismiss an action for ineffective service of process." *George v. O.S.H.A.*, 788 F.2d 1115, 1116 (5th Cir. 1986).

In determining a motion to dismiss for lack of personal jurisdiction, the burden is on the plaintiff to establish that the court has sufficient jurisdiction over the defendant. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Where the trial court addresses the issue only on motion papers and submissions, without an evidentiary hearing, that burden, however, "is only to make a *prima facie* showing of sufficient jurisdictional basis in order to survive a threshold challenge; if jurisdiction remains contested, the plaintiff bears the burden of proof at trial."[8]

---

[8] In citing the language from *Wellington v. Flagship Resort Development*, that "plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence," Celsa incorrectly implies that the preponderance standard applies at this stage. 416 F.3d 290 (4th Cir. 2005); (Celsa's Brief at 9.) That standard is only used when a court decides to conduct an evidentiary hearing. In the absence of an evidentiary hearing, a plaintiff need only make a *prima facie* case for jurisdiction, a lesser burden. *Combs v. Bakker*, cited by Celsa, states this principle clearly. 886 F.2d 673, 676 (4th Cir. 1989).

*Affinity Memory & Micro, Inc. v. K & O Enterprises, Inc.*, 20 F.Supp. 2d 948, 952 n. 4 (E.D. Va. 1998) (citing *Combs*, 886 F.2d at 676).   "In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 776; *see also Reynolds Metals Co. v. FMALI, Inc.*, 862 F. Supp. 1496, 1497-1498 (E.D. Va. 1994) ("In considering a challenge to personal jurisdiction . . . plaintiff is entitled [] to favorable inferences from the pleadings, *affidavits, and documents submitted* on the issue.") (emphasis added); *accord Delta-T Corp. v. Pac. Ethanol, Inc.*, No. 3:08CV524, 2009 U.S. Dist. LEXIS 8151, at *8 (E.D. Va. Jan. 7, 2009).

### III.  Argument.

Celsa argues that service on Grau at his September 15, 2009 deposition in the Barna Litigation was insufficient because it claims that Grau was not an officer, managing or general agent, or an agent authorized to receive service of process on its behalf.  In addition, Celsa argues that Grau was immune from service of process because he was in the jurisdiction as a witness.  As explained below, Celsa is wrong.  At all pertinent times Grau was an agent of Celsa and he was not immune from service.  In addition, subsequent to the filing of its Motion to Dismiss, Celsa was served again pursuant to Rule 4(f)(2)(C)(ii).

Celsa argues that this Court does not have jurisdiction over it.  As explained below, the Court should find Jurisdiction over Celsa because: (1) its alter ego and agent Barna consented to the jurisdiction of the Court when it initiated the Barna Litigation; (2) Celsa is subject to jurisdiction because its agent was served in Virginia, (3) Celsa contracted to sell and ship millions of dollars worth of steel to Virginia, (4) Celsa committed fraud causing tortious injury in Virginia, and (5) Celsa breached a warranty with respect to goods used in Virginia.

Any one of these five reasons independently support jurisdiction over Celsa.

    **A.**    **The Motion to Dismiss for insufficient service under Fed. R. Civ. P. 12(b)(5) should be denied because Celsa was properly served twice.**

Service was effected on Celsa when Grau was served at Barna's September 15, 2009 30(b)(6) Deposition in Norfolk, Virginia.   Service was effected again on April 16, 2010, when CMC served Celsa by mail pursuant to Fed. R. Civ. P. 4(f)(2)(c)(ii).

    **1.**    **Service on Grau at the September 15, 2009 deposition was effective because Grau was an agent of Celsa in Virginia.**

Service on Grau at the September 15, 2009 deposition constituted effective service on Celsa under Virginia Code § 8.01-301(1) because he was an employee and an agent of Celsa at the time of service.   Under that statute, when a foreign corporation transacts business in Virginia without authorization, service may be made on *any* of its agents found within Virginia. *See Consolidated Engineering Co. v. Southern Steel Co.*, 88 F.R.D. 233, 238 (E.D. Va. 1980) (observing that " § 8.01-301(1) provides that personal service may be had on any foreign corporation transacting business in the Commonwealth by service upon any agent of the corporation found within the Commonwealth").   The pertinent language is below:

> Subject to § 8.01-286.1, service of process on a foreign corporation may be effected in the following manner: (1) By personal service on any officer, director or on the registered agent of a foreign corporation which is authorized to do business in the Commonwealth, *and by personal service on **any agent** of a foreign corporation transacting business in the Commonwealth without such authorization, wherever **any such** officer, director, or **agents** be found within the Commonwealth* . . . .

Va. Code § 8.01-301(1) (emphasis added).   It is clear from the choice of words, that the term "any agent" as used in Section 8.01-301(1) is not limited to officers, directors or registered agents.   *Id.*   With respect to foreign corporations not authorized to do business in Virginia, the

term "any agent" means just that, any agent.[9]   However, before service on any agent is

authorized, two tests must be met.   First, the foreign corporation must not be authorized to do

business in Virginia.   Second, the foreign corporation must transact some business in Virginia.

In interpreting the statute, this Court has held that any single act by an agent in Virginia

constitutes transacting business and that service on such an agent is sufficient.   *See Nimir*

*Petroleum Co. v. Baumgart*, No. 1:06cv471, 2006 U.S. Dist. LEXIS 53120, at \*7-11 (E.D. Va.

July 17, 2006)(an agent's "single act of briefing" from Virginia regarding the subject matter of

the litigation constitutes transacting business in Virginia).

  The declaration of Celsa's export manager, Francisco Eloy Sanchez Medialdea

("Sanchez"), that is attached to Celsa's Brief satisfies the first part of the test.   In it Sanchez

states that Celsa is not authorized to do business in Virginia.   (Sanchez Dec., ¶ 4).   With respect

to the second part of the test, Grau's declaration that is attached to Celsa's Brief is important for

what it does not say.   Grau does not say that he is not an agent of Celsa.   He is more careful.

Instead, he denies that he is "an officer, managing or general agent, or ***any other agent***

***authorized by law to receive service of process on behalf of Celsa.*"   (Grau Dec., ¶ 2 (emphasis

added)).   Grau's denial that he is any other agent authorized by law to receive service of process

on behalf of Celsa is irrelevant. As explained above, when applied to foreign corporations that

are not authorized to do business in Virginia, section 8.01-301(1) is not limited to agents

authorized to receive service of process.

  In his declaration, Grau merely attempts to imply that he is not an agent of Celsa.

He admits that he is the General Director of Barna.  Grau Dec, ¶ 1.  He admits also that he is the

---

[9] The contrast with manner of service on foreign corporations that are authorized to do business
in Virginia makes the breadth of the term "any agent" clear.   When a foreign corporation
transacts business in Virginia with authorization, service may be made on only an officer,
director or on the registered agent.   *Id.*

Corporate Supply Chain Director for Celsa Group. *Id.*  In his admission, Grau draws a distinction between Celsa Group and Celsa, contending that Celsa Group is "a confederation of eight principal steel products companies, among which is Celsa" and that Celsa Group "was created for branding purposes for its member companies and is ***independent*** of Celsa."  (Grau Dec., ¶¶ 1,5 (emphasis added)).  This testimony does not establish that he is not an employee or agent of Celsa.  Reading the declarations of Grau and Sanchez together makes this clear.  Sanchez agrees with Grau in claiming that the Celsa Group "was established for 'branding' purposes." (Sanchez, ¶ 3).   But Sanchez goes further and adds that Celsa Group has "no corporate or any separate legal status."  (Sanchez, ¶ 3).  Sanchez's description of Celsa Group is more consistent with that given in the declaration of Jaime Cano Ruiz ("Cano") which Barna submitted to the Court in the Barna Litigation.[10]   In his declaration, Cano claims that Celsa Group is merely a trade name under which various steel companies such as Celsa operate.   Cano Dec., ¶ 10. Accordingly, taking all three men at their word, Grau is likely an employee and agent of each of Celsa Group's member companies, including Celsa.  This is consistent with Grau's deposition testimony: (1) in which he admitted that Celsa Group employees ultimately work for one of the Celsa Group companies; and (2) in which he testified that he had the authority to direct another Celsa employee, Mr. Castán, sign the letter of indemnity. (Grau, 306:1-21, 369:5-25).

While Grau claims in his declaration that Celsa Group is independent of Celsa, even he cannot draw the imaginary line between the two.  Grau does not even know who works for Celsa Group and who works for Celsa.  For example, in his deposition, Grau did not know whether three prominent players in the underlying events, Eloy Sanchez, Ricardo Hugas, or Jose

---

[10] At the hearing on CMC's Motion to dismiss the admiralty claims in the Barna Litigation, the Court ordered Barna to submit an affidavit clarifying the relationship between Barna and Celsa. In response Barna submitted the May 14, 2009 declaration of Cano that is attached as Exhibit 6 (hereinafter, "Cano Dec., __").

Maria, were employees of Celsa Group or Celsa.[11] (Grau, 114:13-21, 179:9-20, 286:16-287:1, and 346:8-10). Moreover, Grau concedes that everyone who works for Celsa has a Celsa Group e-mail address and none other. (Grau, 319:8-13). He further concedes that Celsa Group has no assets independent of the partners. (Grau, 219:12-13). In one e-mail Jose Maria, referenced above, refers to Grau as "The Corporate Supply Chain Director of Celsa," not "Celsa **Group**." A copy of the October 29, 2008 e-mail from Jose Maria is attached as <u>Exhibit 7</u>. In short, there is no legal distinction between Celsa and Celsa Group. Because there is no legal distinction between them, by admitting that he is the Corporate Supply Chain Director of Celsa Group, Grau has admitted that he is an employee and agent of Celsa.[12]

Grau transacted business on Celsa's behalf while in Virginia. As Corporate Supply Chain Director of Celsa Group, Grau was involved in the transaction that is the subject of the Barna Litigation and this litigation. (Grau, 24:5-25:16). His role on Celsa's behalf began in Barcelona. Grau instructed the stevedores in Barcelona on his authority as Corporate Supply Chain Director of Celsa Group. (Grau, 158:5-24 and 161:6-25). On November 5, 2008, Grau, as Corporate Supply Chain Director of Celsa Group, was at the port in Barcelona working with CMC's Shankar Tahilramani on stowage issues. (Grau, 191:17-24)(Radhakrishna, 25:8-28:2).[13] Later, as Corporate Supply Chain Director of Celsa and on behalf of Barna, Grau traveled to Norfolk, Virginia, to conduct business on Celsa's and Barna's behalf with respect to issues that

---

[11] Celsa thought Eloy Sanchez important enough to submit his declaration in support of the Motion to Dismiss.

[12] Where appropriate, this brief will continue to honor the distinction drawn in Grau's testimony between Celsa Group and Celsa so as not to mischaracterize the words that Grau actually used. However, as explained above, no real distinction exists and by accurately repeating Mr. Grau's self serving testimony, CMC does not accede to that distinction.

[13] Radhakrishna was the captain of the M/V SATURNUS. Copies of the cited pages from Captain Radhakrishna's January 31, 2009 deposition transcript are attached collectively as <u>Exhibit 8</u>).

are the subject of this and the Barna Litigation. (Grau, 54:11-23).  Over a month before litigation was initiated by Barna, on November 17, 2008 Grau flew to Norfolk and stayed through December 1, 2008.[14] (Grau, 87:17-22).  While in Norfolk, Grau telephoned CMC's Operations Supervisor, Shankar Tahilramani, regarding who was going to unload the Vessel. (Grau, 113:9-18 and 133:10-23).  While in Norfolk, Grau communicated with Oldendorff regarding who was going to unload the vessel. (Grau, 115:24-116:8).

From Norfolk, Grau instructed a Celsa employee, Carlos Castán to sign the letter of indemnity that is at the heart of CMC's fraud claim.  Carlos Castán, a Celsa employee signed the letter of indemnity in Barcelona on November 19, 2008.  (Grau, 368:9-369:21); Exhibit 4. Grau would have signed the letter of indemnity had he not been in Norfolk between November 17, 2008 and December 1, 2008. (Grau, 87:17-22).  Castán signed the letter of indemnity because Grau was unavailable. (Grau, 410:1-411:10).  Grau gave Castán the authority to sign the letter of indemnity.  (Grau, 369:22-370:14).  Carlos Castán had access to and used Barna's seal in signing the letter of indemnity.  Exhibit 4.  It is a fair inference that Grau instructed Castán to sign the letter of indemnity at a point in time in close proximity to when Castán actually signed it. Accordingly, it is a fair inference that such instruction was given by Grau while Grau was in Norfolk.

Grau also returned to Norfolk in January 2009 to conduct additional business on behalf of both Celsa Group and Barna.[15] (Grau, 87:13-15).

---

[14] Barna filed its complaint on December 22, 2008.

[15] As explained below, Barna acted as Celsa's agent in Virginia.  Service on Grau in his capacity as the CEO of Barna, constitutes service upon an agent of Celsa and therefore service upon Celsa. *See Clover Leaf Freight Lines, Inc. v. Pacific Coast Wholesalers Asso.*, 166 F.2d 626, 631 (7th Cir. 1948)(service upon president of corporation that was agent of defendant constitutes effective service in defendant).

In sum, Grau traveled to Norfolk at least twice on behalf of Celsa, communicated with CMC and Oldendorff regarding the underlying dispute while in Norfolk, and issued instructions from Norfolk to a Celsa employee to sign the letter of indemnity that is the heart of CMC's fraud claim. This constitutes transacting business in Virginia by an employee and agent of Celsa.  Section 8.01-301(1) authorizes service of process upon "any agent" in those circumstances.  Grau is an agent of Celsa and CMC's service of process on Grau constituted effective service on Celsa.

>    **2.    Grau was not immune from service during his deposition because he was being deposed in a matter directly related to the matter in which he was served.**

Grau was not immune from service during his deposition. "There is generally no immunity from service of process when the suit in which the immunity is sought is part of, or a continuation of, the suit for which the person claiming immunity is in the jurisdiction." 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1080, at 423 (3d ed. 2004); *Northern Light Tech., Inc. v. Northern Lights Club*, 236 F.3d 57, 62 (1st Cir. 2001) (explaining that "the extension of the privilege has been limited by the majority of courts to cases in which the party or witness was participating in an *unrelated* litigation at the time he was served with process in the forum state" (emphasis added)).

Process immunity is not an unqualified right as Celsa's Brief suggests. It is a privilege of the Court, not of the party being served. See *Lamb v. Schmitt*, 285 U.S. 222, 225 (U.S. 1932); *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916). Its purpose is to avoid discouraging the voluntary attendance of parties in court proceedings. *St. Paul Surplus Lines Ins. Co. v. Davis*, No. 91-2213, 1993 U.S. App. LEXIS 234, *8-9 (4th Cir. Jan. 8, 1993). Because of that purpose, the majority of courts limit immunity to those cases in which the party or witness was

participating in an *unrelated* litigation at the time he was served with process in the forum. *Northern Light,* 236 F.3d at 63.   The rationale of the differing lawsuit pre-requisite is that the sole purpose of granting immunity is to prevent "interference with the progress of a cause pending before [a court] by the service of process in *other suits . . . .*"  *Lamb,* 285 U.S. at 225 (emphasis added).   The privilege's scope is narrow.   In recognizing the privilege, the Supreme Court also cautioned that, "[t]he process immunity privilege should not be enlarged beyond the reason upon which it is founded, and . . . should be extended or withheld only as judicial necessities require."  *Id.* at 225.   Ultimately, the decision whether to confer immunity is within this Court's discretion. *See Northern Light* at 62.

The cases cited by Celsa do not support its argument.  *Stewart v. Ramsay* merely follows the general rule in limiting immunity to situations involving unrelated cases.  242 U.S. at 129 (1916).  *Celanese Corp. v. Duplan Corp.* is the same.  *See* 502 F.2d 188, 189 (4th Cir. 1974) (affirming district court's conferring of immunity where cases were unrelated and on finding that service would be disruptive).   In addition, unlike here, in *Celanese*, the party seeking immunity asked the trial court to confer immunity prior to the party's appearance in the forum.   The older cases cited by Celsa are unhelpful as they contain no analysis of their respective court's reasoning.  *See Moylan v. AMF Overseas Corp., S.A.*, 354 F.2d 825, 829 (9th Cir. Guam 1965) (no analysis); *Mississippi Wood Preserving Co. v. Rothschild*, 201 F.2d 233 (5th Cir. Miss. 1953) (addressing jurisdictional issues under a state statute and without analysis of immunity).  *Shapiro & Son Curtain Corp. v. Glass*, 348 F.2d 460, 462 (2d Cir. N.Y. 1965) is a different story.  Were it good authority, it would be supportive of Celsa's argument.   However, as pointed out in *Northern Light*, *Shapiro* erroneously ignores *Lamb's* limitation of the application of process immunity to unrelated cases. *See* 236 F.3d at 63n.9 ("We reject [the] view [in *Shapiro*], as *Lamb*

definitively retains the distinction between presence in the forum state for related and unrelated cases").  Accordingly, none of those cases support Celsa's argument.

Immunity should not be conferred on Grau.  First, as explained above, this litigation is not only related, but interrelated with the Barna Litigation.  They involve the same facts, same issues, the same players, and many of the same witnesses.  Second, granting immunity would not serve the purpose to avoid discouraging the voluntary attendance.  As the Plaintiff in the Barna Litigation, Barna was obligated to have its 30(b)(6) witnesses available for deposition in this district.  Local Rule 30(A).  Mr. Grau's attendance at his deposition was not voluntary.  Third, as explained above, Grau personally conducted business in Virginia on behalf of Celsa.  Finally, to find Grau immune would reward Celsa for its jurisdictional gamesmanship. Celsa used its control over and identity with Barna to fraudulently obtain "clean" bills of lading so that it could obtain payment in full for the damaged steel.  It then used Barna as its proxy in the United States to file suit and force CMC to take delivery of the damaged steel without Celsa having to make a direct appearance and answer for its fraud and breaches of contract.[16] Although clever, this maneuvering should not be allowed to benefit Celsa.  Therefore, this Court should, in its discretion, find that Grau was not immune from service.

### 3.  Service under Fed. R. Civ. P. 4(f)(2)(c)(ii) was effective because the proper procedures were followed and the service package was delivered to Celsa.

Service upon a foreign corporation may be effected under Fed. R. Civ. P. 4(f)(2)(C)(ii) by "using any form of mail that the clerk addresses and sends to the [company] and that requires a signed receipt," unless such form of service is prohibited by the foreign country's

---

[16] Celsa was forced to take delivery in order to mitigate its losses and to avoid a total loss of its $15,256,408.47.

law.[17]   Spain is a signatory to the Hague Convention and has not opted out of service by mail.[18]

Accordingly, Celsa may be served pursuant to rule 4(f)(2)(C)(ii).

CMC effected service upon Celsa pursuant to Rule 4(f)(2)(C)(ii).  On April 14,

2010, CMC caused the Clerk of this Court to ship a United Parcel Service ("UPS") package

containing an original and two copies of the Summons and Complaint issued on April 5, 2010

together, with three copies of the certified Spanish translation of the Summons and Complaint in

an effort to obtain service on Celsa at the address that Celsa provided on page one of Celsa's

Brief.  Celsa was informed of CMC's efforts to effect service by mail because the Clerk caused

two Notices of Electronic Filing to issue to all counsel of record that day.  UPS subsequently

delivered the package to Celsa on April 16, 2010, however, Celsa refused to accept the package.

A true, genuine, and authentic copy of the receipt from UPS stating "THE RECEIVER DID

NOT WANT THE ORDER AND REFUSED THE DELIVERY" is attached as Exhibit 11.

Celsa's refusal of delivery does not prevent service from being effective.  To

prove service under Rule 4(f)(2)(C)(ii), Rule 4(l)(2) requires "a receipt signed by the addressee,

*or by any other evidence satisfying the court that the summons and complaint were delivered to*

*the addressee*."  (emphasis added).  The UPS receipt constitutes "*other evidence satisfying the*

*court that the summons and complaint were delivered to the addressee.*"  The Tenth Circuit has

upheld this method of proof in a similar context.  In *Nikwei v. Ross School of Aviation, Inc.*, 822

F.2d 939 (10th Cir. 1987), the plaintiffs obtained a default judgment against the defendants, and

---

[17] November 7, 2000 Memoranda from Leonidas Ralph Mecham, Director Administrative Office of the United States Courts.  A true, genuine, and authentic copy of the memoranda is attached as Exhibit 9.

[18] An official list of the members of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters together with a list of each member's exceptions evidencing Spain's recognition of this means of service of process is attached as Exhibit 10.

one of the defendants moved to have the default judgment reversed arguing the judgment was invalid for failure of proper service.  The plaintiff attempted to serve the defendant by, among other means, certified mail, return receipt requested.[19]  The return receipt was unsigned and stated "refused." *Id*. at 940.  The trial court held that service was sufficient and the appeals court affirmed recognizing "courts view service by registered or certified mail as being complete when such is refused through the act of the defendant."  *Id*. at 945.[20] [21]

    **4.    Service on Celsa was effective pursuant to Virginia Code § 8.01-288 because Celsa actually received notice of the Complaint.**

       If the Court holds that CMC's attempts to obtain service of process on Celsa are insufficient as matter of law, Celsa is still properly before the Court.  Virginia Code § 8.01-288, commonly referred to as Virginia's curing statute, provides "process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided by this chapter."  In *Allied Towing Corp., v. Great Eastern Petroleum Corp.*, 642 F.Supp. 1339 (E.D. Va. 1986), this Court recognized that it can look to Virginia's curing statute where insufficient service of process occurs, but the defendant received notice of the action notwithstanding.

---

[19] Service was attempted in *Nikwei* pursuant to a state statute that is similar to Fed. R. Civ. P. 4(f)(2)(C)(ii).

[20] To avoid having to litigate CMC's second effort at serving Celsa, on April 22, 2010, counsel for CMC wrote counsel for Celsa explaining why service was effective and asking about Celsa's position.  A true, genuine, and authentic copy of that letter is attached as Exhibit 12.  On April 27, 2010, Celsa's counsel responded Celsa would not take a position regarding CMC's assertion that proper service was obtained through UPS delivery.  A true, genuine, and authentic copy of that letter is attached as Exhibit 13.

[21] The United States has also reserved its right to allow a party that has obtained service in this manner to obtain "judgment even if no certificate of service or delivery has been received …" Exhibit 10, pg. 33.  CMC's second attempt at service is compliant with this exception.  It follows that CMC's inability to return a signed certificate which was directly caused by Celsa is not a failure to obtain service.

In *Allied Towing*, a defendant sought to have a third-party complaint dismissed for failure of service and lack of jurisdiction.  The third-party claim stemmed from the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the defendant was served through nationwide service of process.  *Id.* at 1353.  The defendant argued that nationwide service was not authorized for claims arising from CERCLA.  The Court held that:

> This Court need not reach this issue.  The validity of the actual service of the complaint pursuant to Fed. R. Civ. P. 4(e) may also be determined by state law.  In this instance the Court need go no further than Va. Code Ann § 8.01-288 … Since [the defendant] does not dispute that it actually received the process in a timely manner, there is no defect as to the physical service of process.

*Id.*  It is clear from the record that Celsa is in receipt of the Complaint.  The curing statute applies in this case, and even if the Court holds that the other methods of service were insufficient, Celsa is still properly before the Court.

**B.**　　　**The Motion to Dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) should be denied because Celsa consented to this Court's jurisdiction when Barna filed suit in this Court.**

Barna consented to personal jurisdiction when, as a non-resident, it filed suit in this District for a cause of action involving the same transaction.  *Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d 888, 897 (D. Md. 2008) (citing  *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1372 (Fed. Cir. 2002) (concluding that because the defendant "voluntarily invoked the court's jurisdiction as a plaintiff in a class action, it waived its personal jurisdiction defense to the suits brought by [the plaintiff].");  *General Contracting & Trade Co. v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991) (holding that a defendant who elected to avail itself of the benefit of a state court's jurisdiction by filing a prior suit against the same party waives its personal jurisdiction defense in all actions related to the claim and arising out of the

same nucleus of operative facts for which it originally invoked the court's jurisdiction)).

On December 22, 2008, Barna filed suit in this district for damages related to this transaction. Accordingly, Barna has submitted to the jurisdiction of this Court. Because Barna submitted to personal jurisdiction in this District, jurisdiction over Celsa is proper as well.

### 1.    Celsa consented to this Court's jurisdiction through its agent, Barna.

The Virginia long arm statute, and many similarly drafted jurisdictional statutes in other states, specifically contemplates that a principal cannot avoid jurisdiction simply by directing his actions towards Virginia through an agent. Virginia Code. § 8.01-328.1 ("A court may exercise personal jurisdiction over a person, who acts directly *or by an agent*") (emphasis added). The rule that an agent's actions can submit the principal to personal jurisdiction has been acknowledged and accepted by federal courts in the Fourth Circuit and across the country. *See e.g. Boyd v. Green*, 496 F. Supp. 2d 691, 710 (W.D. Va. 2007) (noting that "actions undertaken through an agent on behalf of a defendant can establish personal jurisdiction under Virginia Code § 8.01-328.1(A)"); *Newberry v. Pierce Assoc., Inc.*, No. 94-1089, 1995 U.S. App. LEXIS 24979, at *5 (4th Cir. Sept. 5, 1995) (affirming finding that "South Carolina courts did have personal jurisdiction over Pierce based on the actions of its agent…"); *AP Links, LLC v. Global Golf, Inc.*, No. CCB-08-705, 2008 U.S. Dist. LEXIS 70870, at *10 (D. Md. Sept. 2, 2008) (analyzing whether an agency relationship existed in assessing personal jurisdiction); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 722 (D. S.C. 2007) ("[t]he contacts within the forum of a party's agent, partner or joint venturer may, in appropriate circumstances, be attributed to the party for purposes of establishing jurisdiction"); *United States v. Coleman*, No. 7:00-CV-127-BR(1), 2001 U.S. Dist. LEXIS 23682, at *18 (E.D.N.C. July 30, 2001) (finding that because a partner acted as an agent of the other general partners, "his actions would also subject them to personal jurisdiction"); *Sparrow v. Goodman*, 376 F. Supp. 1268, 1271 (W.D.N.C. 1974)

(principal may be subject to jurisdiction on account of the acts of an agent acting within the scope of his authority); and *Grand Entm't Group v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) ("[A]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction"). *See also generally, Szantay v. Dixie Aviation Co.*, 237 F. Supp. 393 (E.D.S.C. 1965) (agent's contact can cause non-resident to be subject to personal jurisdiction); *La Porte Heinekamp Motor Co. v. Ford Motor Co.*, 24 F.2d 861 (D. Md. 1928) (agent can create personal jurisdiction on non-resident defendant).

An agency relationship is established for jurisdictional purposes when the alleged agent acted within the forum state "for the benefit of, with the knowledge and consent of, and under some control by, the non-resident principal." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) (analyzing personal jurisdiction under New York statute that authorizes jurisdiction when a party acts "in person or through an agent"); *see also Nuckols v. Nuckols*, 320 S.E.2d 734, 740 (Va. 1984) ("Agency has been defined as the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act . . . .").

In *Stokes v. Geismar*, 815 F. Supp. 904 (1993), the plaintiff filed suit against a French manufacturer of construction equipment, and its sole distributor in the United States. *Id.* at 906. The French Manufacturer had no meaningful contacts in Virginia or the United States; however, the distributor "willingly sold to entities throughout the Unites States, including Virginia, thereby purposefully availing itself of Virginia, as well as other states' markets." *Id.* at 907. Although the court did not go so far as to say the distributor was an alter-ego of the manufacturer, in extending personal jurisdiction to the manufacturer, the court stated "[The manufacturer] should not be permitted to distribute its products throughout the Unites States, but

19

at the same time shield itself from liability by acting through a subsidiary, *especially when the entities are headed by the same individuals and have such overlapping operations.*"   *Id.* (emphasis added).

Barna is an agent of Celsa because it acted for Celsa's benefit, with Celsa's knowledge, and under Celsa's control.  Celsa engaged and directed Barna to ship the steel to the United States (including Norfolk, Virginia) for the benefit of Celsa and its contract with CMC. As explained above, Barna used its relationship with the Naviera Barcelonesa, S.A., the Vessel's agent at the loadport in Barcelona to induce the agent to issue the "clean" bills of lading.  This directly benefited Celsa by allowing Celsa to obtain payment under CMC's letter of credit despite the damage to the steel.  Barna filed suit in this Court to force CMC to take delivery of the damaged steel or otherwise suffer a total loss of its $15,256,408.47.  As in *Stokes*, Barna and Celsa have overlapping operations.  They are both controlled by Francisco Rubiralta. (Grau, 35:17-20, 37:8-19, 134:21-23, 247:25-249:5).  They are both owned by Francisco Rubiralta. *Id.* Grau, who claims to be Barna employee, is paid by Celsa Group.  (Grau, 413:13-414:4).  Grau, an employee and agent of Celsa, directed the activities of Barna in Virginia for the benefit if Celsa.

**2.       Celsa consented to the jurisdiction of this Court through its *alter ego*, Barna.**

Beyond the existence of a principal/agent relationship, jurisdiction over one corporate entity is also proper where there is personal jurisdiction over an alter-ego of that entity. *Colt Def. v. Heckler & Koch Def., Inc.*, No. 2:04cv258, 2004 U.S. Dist. LEXIS 28690, at *56 (E.D. Va. Oct. 22, 2004).  A contrary result "might well allow a company's alter ego to abuse the corporate form and then escape process and liability in Virginia for acts of the company that occur in Virginia and are directed by the alter ego." *Int'l Bancorp, L.L.C. v. Societe des Bains de*

*Mer et du Cercle des Etrangers a Monaco*, 192 F. Supp. 2d 467, 477 (E.D. Va. 2002).  Federal courts have consistently acknowledged that "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Hanson & Morgan Livestock, Inc. v. B4 Cattle Co., Inc.*, No. 5-07-cv-00330, 2008 U.S. Dist. LEXIS 65707, at *20–21 (S.D. W. Va. Aug. 27, 2008) (citing *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 653 (5th Cir. 2002); *Quebecor World (USA), Inc. v. Harsha Assocs.*, 455 F. Supp. 2d 236, 244 (W.D.N.Y. 2006); *Miramax Film Corp. v. Abraham*,  01-cv-5202, 2003 U.S. Dist. LEXIS 21346, at *7 (S.D.N.Y. Nov. 25, 2003) ("If personal jurisdiction exists over the dominating entity, then it exists over its corporate alter egos.")).

Although the majority of alter-ego cases involve a parent/subsidiary relationship, the same theory applies to other relationships such as sister-corporations.  The Third Circuit discussed the few cases addressing sister-corporations as alter-egos in *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131 (3d Cir. 1988).  The Third Circuit highlighted two scenarios where the alter-ego theory should apply to sister-corporations.   As in *Perini America, Inc. v. Paper Converting Machine Co.*, 559 F. Supp. 552 (E.D. Wis. 1983), *overruled on other grounds by Johnston v. IVAC Corp.*, 885 F.2d 1574 (Fed. Cir. 1989)**,** sister corporations can be found to be alter-egos where both corporations are entirely owned by a parent corporation. *Id.* at 553 (stating "both corporations are the 'alter ego' of Fabio Perini (who owns 100 % of one and 99.5 % of the other) and to treat them as unrelated entities would defy reality").  The alter-ego theory should also apply to sister-corporations "where the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf." *Gerling*, 839 F.2d at

141 (citing *Alimenta, Inc. v. Anheuser-Busch Co.*, 99 F.R.D. 309, 313 (N.D. Ga. 1983) (the sisters had acted as one in the transaction at issue and the sister possessing the documents had assisted its sibling in litigating the case)).[22]

   For purposes of personal jurisdiction, Barna and Celsa are alter egos. Ownership and control are the same. Francisco Rubiralta owns and is in charge of Celsa and Barna. (Grau, 35:17-20, 37:8-19, 134:21-23, 247:25-249:5). The employees overlap. In an email to CMC concerning the steel at issue, at least one person on the other side of the transaction from CMC represented himself as an employee of, "Barna Conshipping / Celsa Group." A copy of the October 3, 2008 e-mail is attached as <u>Exhibit 14</u>, pg. CMC_SATURNUS0001176-1177. Every employee of Barna has a Celsa Group e-mail address as well as a Barna e-mail address. (Grau, 319:3-13). When in the United States, Grau passed out business cards showing he was employed by both Barna and Celsa Group.[23] Copies of Grau's business cards are attached as <u>Exhibit 15</u>. Grau has e-mail addresses for both Barna and for Celsa Group. (Grau, 311:1-5). Grau admits he works for both Barna and Celsa Group. (Grau, 311:6-313:6). The Celsa Group sets Grau's salary. (Grau, 413:13-414:4). Grau has authority to sign letters of indemnity that bind Celsa. (Grau, 370:2-21 and 412:413:12). The physical addresses of Barna and Celsa are the same. (Grau 25:25-26:6). Barna works almost exclusively for Celsa Group.[24] Barna and Celsa even share lawyers. Legal advice that was given to Celsa Group regarding the dispute with CMC was

---

[22] Although both cases cited address the alter-ego theory in regards to compelling a non-party corporation to produce documents in discovery, the Courts' decisions to compel discovery of the alter-ego company are based upon the level of control one company holds over the other; therefore, the same logic applies to the question of jurisdiction. *See Alimenta*, 99 F.R.D. at 313; *Perini*, 559 F. Supp. at 552–553. *See also Colt*, 2004 U.S. Dist. LEXIS 28690, at *53.

[23] However, it appears that he Barna business card did not exist prior to Grau's January return to Norfolk as he had new Barna business cards prepared immediately prior to his return. (Grau, 89:4-90:11).

[24] At the time of contracting 95% of Barna's work was for companies in the Cesla Group. (Grau, 38:15-39:6).

forwarded directly to Barna. (Grau, 289:2-20). Grau, on behalf of Celsa Group, communicated by e-mail with Barna's counsel in the Barna Litigation regarding strategy. A copy of the June 30, 2008 e-mail from Grau to Dan Warman is attached as <u>Exhibit 16</u>, pg. 15214). Celsa not Barna, nominated the vessel that it would charter to transport the steel. A copy of the October 20, 2008 e-mail from Mayte Diaz is attached as <u>Exhibit 17</u>, pg. CMC_SATURNUS0001501-1504. CMC accepted the Vessel nomination noting that Celsa was the charterer. Exhibit 17, pg. CMC_SATURNUS0001499-1500 (October 21, 2008 email from CMC's Antonio Pinhiero). Neither Barna nor Celsa, attempted to correct CMC's understanding as to who was chartering the vessel. *Id.*

To extend jurisdiction to an alter-ego corporation, Virginia law requires some "proof that the alleged alter-ego used the corporation to disguise some legal wrong. *Colt*, 2004 U.S. Dist. LEXIS 28690, at *57. Here, Celsa used Barna to conceal its breach of contract and obtain full payment for the damaged steel. Additionally, Celsa fraudulently caused or induced Barna to procure "clean" bills of lading that did not accurately reflect the condition of the steel. Compl. ¶ 33. The purpose of this fraud was to allow Celsa to obtain full payment despite the damage to the steel. Compl. ¶ 37–38. Then Celsa used Barna as its proxy in the United States to file suit and force CMC to take delivery of the damaged steel without Celsa having to make a direct appearance and answer for its fraud and breaches of contract. Celsa has and is using its alter ego to perpetrate and insulate its fraud. According, it is appropriate for this Court to exercise jurisdiction over Celsa.

### B. The Motion to Dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) should be denied because Celsa is subject to personal jurisdiction in this Court even if Barna's filing suit here is not deemed consent.

Federal courts, including the Fourth Circuit Court of Appeals, start with a two-

part test to determine whether personal jurisdiction exists over a non-resident defendant. *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). Personal jurisdiction is only present if "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). However, this two-part test is merged into a single consideration of whether the exercise of personal jurisdiction is consistent with due process. *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000). "Virginia's long-arm statute extends personal jurisdiction to the fullest extent permitted by due process." *Coastal Video Commc'ns Corp. v. The Staywell Corp.*, 59 F.Supp. 2d 562, 565 (E.D. Va. 1999).

Under its long-arm statute, Virginia is a "single transaction" state, meaning that a single act by a non-resident defendant can qualify as submitting the defendant to Virginia courts' jurisdiction. *Affinity Memory*, 20 F. Supp. 2d at 952. The Virginia Code provides that "[t]ransacting any business" in Virginia that gives rise to a cause of action is sufficient to confer jurisdiction. *English & Smith*, 901 F.2d at 38.

Due process is satisfied if the defendant has sufficient "minimum contacts" with the forum state. A defendant cannot be forced to defend himself in the forum state in violation of "traditional notions of fair play and substantial justice." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers,. Inc.*, 334 F. 3d 390, at 397 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Under *International Shoe* and its progeny, there are two kinds of *in personam* jurisdiction, either "general" or "specific." *Coastal*, 59 F.Supp. 2d at 565.

Specific jurisdiction exists "when the [defendant's] contacts relate to the cause of action and create a substantial connection with the forum state." *Diamond Healthcare*, 229 F.3d at 450. "In determining whether specific jurisdiction exists, [a court will] consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *Coastal*, 59 F.Supp. 2d 562, 565 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-712 (4th Cir.2002)). This test requires both that the claims arise out of the defendant's contacts with the forum state, and that, given those contacts, it would be reasonable for the court to exercise jurisdiction over the defendant. In contrast, "[g]eneral personal jurisdiction is exercised where the matter is not one arising out of or related to the nonresident defendant's contacts with the forum." *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, at 414, n.9 (1984). Instead, general jurisdiction arises out of the defendant's quantity and quality of contacts with the forum state. *Id.* General jurisdiction is appropriate when a nonresident defendant has contacts with the forum state that are "continuous and systematic." *Coastal*, 59 F.Supp. 2d 562, 565 (quoting *ALS Scan,* 293 F.3d at 711-712). Specific jurisdiction exists over Celsa. Accordingly, jurisdiction is appropriate over Celsa even if contracts with Virginia are not continuous and systematic.

**1.    Celsa is subject to personal jurisdiction because it transacted business in Virginia through an agent who was served with process while in Virginia.**

"Jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'" *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 615 (U.S. 1990) (plurality opinion of SCALIA, J.) ("We do not know of a single state

or federal statute, or a single judicial decision resting upon state law, that has abandoned in-state service as a basis of jurisdiction. Many recent cases reaffirm it."). "Indeed, a defendant passing through a state for a few hours and served with process is subject to that state's jurisdiction." *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 729 (E.D. Va. 2003); *Blackson v. Blackson*, 40 Va. App. 507, 522 (Va. Ct. App. 2003) (same).

Celsa has challenged service on its agent, Grau. However, as explained above, service on Grau was effective. Accordingly, service upon him in Virginia, without more, establishes this Court's jurisdiction over Celsa.

### 2. Celsa is subject to jurisdiction in Virginia because it contracted to sell millions of dollars worth of steel to be shipped to Virginia.

Even if this Court were to find that service on Grau was not effective, Celsa is still subject to this Court's jurisdiction under the stream of commerce theory. Due process is satisfied as long as a foreign manufacturer knows and intends that its product will be sold in the forum state. *Weight v. Kawasaki Motors Corp.*, 604 F. Supp. 968, 971 (E.D. Va. 1985).

While generally applied to products liability claims, other jurisdictions have applied the "stream of commerce" theory to actions involving property damage, economic loss, and breach of contract as well. *Synergy, Inc. v. Manama Textile Mills, W.L.L.*, No. 06-4129, 2008 U.S. Dist. LEXIS 12791, at *32–33 (D.N.J. Feb. 20, 2008). Those cases explain that there is "no basis for allowing the nature of the injury to preclude the application of the stream of commerce theory." *Id.* (internal citations omitted). Consistent with these cases, the Court in *Dee-K Enterprises, Inc. v. Heveafil*, 982 F. Supp. 1138 (E.D. Va. 1997), found jurisdiction under the stream of commerce theory for an anti-trust action. At the time of contracting, Celsa knew that a significant portion of the steel would be shipped to Norfolk would end up in this

jurisdiction's stream of commerce.[25]   The contract between Celsa and CMC, specifically acknowledges that 2,700 metric tons of the steel would be delivered to Norfolk, Virginia.   A chain of e-mails that Grau identifies as the CMC/Celsa Contract is attached as Exhibit 18. Moreover, Celsa's agent, Grau, traveled to Virginia at least twice to effectuate the shipment.

In *Ajax Realty Corp., v. J.F. Zook, Inc.,* 493 F.2d 818 (4th Cir. 1972), the Fourth Circuit found due process satisfied where the defendant corporation had directly shipped window frames to Virginia, sent a representative to Virginia to inspect the alleged defects, and had a reasonable expectation that the frames would be used in Virginia.  *Ajax,* 492 F.2d 818.  Celsa contracted to sell approximately $20,000,000 worth of steel to CMC, and to ship a significant portion of that steel to Virginia.  Celsa sent a representative to Virginia to address the unloading prior to any litigation.  Celsa reasonably expected that some or all of the steel would be used in Virginia.  Consequently, due process is satisfied.

---

[25] Contrary to Celsa's contention (Celsa's Brief, 12), the shipping terms CNFFO making CMC bear the risk of loss upon loading, are not controlling for jurisdictional purposes.  See *Weight*, 604 F. Supp. at 969 (denying motion to dismiss for lack of personal jurisdiction despite fact that all shipments were F.O.B. Japan.).  *See also, Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993) ("[T]he fact that title to the [goods] passed to [the resident party] in France rather than in the United States in no way determines the degree of contacts between the United States and [the non-resident party].");  *Oswalt v. Scripto, Inc.,* 616 F.2d 191, 197 n.8 (5th Cir. 1980) ("We note that jurisdiction does not depend on the technicalities of when title passes.");  *L.D. Reeder Contractors of Ariz. v. Higgins Indus., Inc.,* 265 F.2d 768, 774 (9th Cir. 1959) (disregarding a passage of title/risk of loss arrangement in determining the "controlling" jurisdictional contacts); *Moore v. Little Giant Indus., Inc.,* 513 F. Supp. 1043, 1047 (D. Del. 1981) (rejecting resolution of jurisdictional determination based on the passage of title and risk of loss provision).

In support of its argument that shipping terms should control for jurisdiction, Celsa relies heavily on a decision from the Eastern District of Pennsylvania, *Thypin Steel Co., Inc. v. M/V Mikhail Strekalovskiy,* No. 96-1799, 1997 U.S. Dist. LEXIS 4454 (E.D. Pa., April 3, 1997). However, as the court stated in *Synergy*, the court in *Thypin* "declined to exercise personal jurisdiction because no other minimum contacts were alleged aside from the 'C&F' terms of the shipping contract."  *Synergy*, 2008 U.S. Dist. LEXIS 12791, at *24.   That is not the case here. The Court must also consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).

For the reasons stated above, CMC has shown that Virginia's long-arm statute applies and the assertion of jurisdiction is consistent with due process; therefore, the Court should deny the Motion to Dismiss.

    **3.**    **Celsa is subject to jurisdiction in Virginia because its fraud, from which it derived substantial revenue, caused tortuous injury in Virginia.**

This Court may exercise personal jurisdiction pursuant to the Virginia long arm statute over a corporation that causes tortious injury in Virginia by an act or omission outside Virginia if it 1) regularly does or solicits business; 2) engages in any other persistent course of conduct; *or* 3) *derives substantial revenue from goods used or consumed or services rendered in Virginia*.  Va. Code Ann. § 8.01-328.1(A)(4) (emphasis added).  Jurisdiction may be attained whether the corporation "acts directly, or by an agent." *Id.*

As the Fourth Circuit stated in *Ajax*, "it is difficult to identify an absolute amount which *ipso facto* must be deemed 'substantial'" under the statute.  492 F.2d. at 822.  However, the Fourth Circuit found $37,000 sufficiently substantial in *Ajax*, and the Western District found $25,000 sufficiently substantial in *Jackson v. Nat'l Linen Serv. Corp.*, 248 F. Supp. 962 (W.D. Va. 1965).

In determining whether there was "substantial revenue," the Court should consider 1) that the revenue derived from sales, and not profits, must be substantial; 2) that the revenue may be derived from a single transaction; and 3) that the sale itself need not take place in Virginia so long as the goods are used or consumed in this state.  *Gordonsville Indus., Inc. v. American Artos Corp.*, 549 F. Supp. 200, 203 (W.D. Va. 1982).

Celsa and Barna committed fraud by procuring "clean" bills of lading that did not accurately reflect the condition of the steel.  Compl. ¶ 33.  They used the "clean" bills of lading

to obtain payment in full despite knowing the steel was damaged.  The sole purpose of this fraud was to receive the purchase price under the contract—$15,256,408.47.  Compl. ¶ 38.  Celsa received over a million dollars in revenue from the steel it shipped to Virginia.  Because Celsa received substantial revenue from goods used or consumed in Virginia, the Court may exercise personal jurisdiction over Celsa for a cause of action arising out of its fraud.

> **4.**      **Celsa is subject to jurisdiction in Virginia because it breached a warranty from which it derived substantial revenue.**

This court may exercise personal jurisdiction pursuant to the Virginia long arm statute over a corporation that causes injury in Virginia by breaching a warranty for the sale of goods outside of Virginia when the corporation might have reasonably expected a person to use, consume, or be effected by the goods and the corporation 1) regularly does or solicits business; 2) engages in any other persistent course of conduct; *or* 3) *derives substantial revenue from goods used or consumed or services rendered in the Commonwealth*.  Va. Code Ann. § 8.01-328.1(A)(5) (emphasis added).

Celsa warranted it would provide "prime" steel.  Compl. ¶ 5.  The steel that arrived in Norfolk was not "prime" in breach of the warranty.  Compl. ¶ 18.  The steel did not conform to the contract in breach of the warranty.  Compl. ¶ 28.  Celsa knew that the steel would be used in Virginia.  Celsa received substantial revenue from the transaction as shown above and the holding in *Ajax* demonstrates that the Court has jurisdiction over Celsa for its breach of warranty. 492 F.2d at 822.[26]

---

[26] CMC did not bring a breach of warranty claim in its Complaint, however, CMC did assert a breach of contract claim.  In *Alcan Aluminum Corp. v. BASF Corp*., No. 3:97-1480, 2001 U.S. Dist. LEXIS 16807 (N.D. Tex. Oct 17, 2001), the court found breach of contract claims "indistinguishable" from breach of warranty claims.  *Id.* at 19-20

## IV.    Conclusion.

As explained above, this Court enjoys broad discretion in determining whether to dismiss an action for ineffective service of process.  CMC has demonstrated that Grau was an agent of Celsa at the time of service and that she should not be given immunity from service.  In the alternative, CMC has shown that it properly effected service under Fed. R. Civ. P. 4(f)(2)(c)(ii).

With regard to personal jurisdiction over Celsa, CMC need only make a *prima facie* showing of sufficient jurisdictional basis in order to survive a threshold challenge.  Contrary to Celsa's arguments, at this stage, CMC need not establish personal jurisdiction by a preponderance of the evidence.   Nonetheless, as set forth above, given the favorable inferences to which CMC is entitled, CMC has established personal jurisdiction over Celsa by a preponderance of the evidence.   In fact, the evidence is overwhelming.

Accordingly, this Court should deny Celsa's Motion to Dismiss.

COMMERCIAL METALS COMPANY,
*d/b/a* CMC DALLAS TRADING

By: /s/____Andrew J. Huige_____
        Of Counsel

George H. Bowles, Esquire (VSB #38754)
gbowles@williamsmullen.com
Andrew J. Huige, Esquire (VSB #73734)
ahuige@williamsmullen.com
Counsel for COMMERCIAL METALS COMPANY,
*d/b/a* CMC DALLAS TRADING
Williams Mullen
A Professional Corporation
222 Central Park Avenue, Suite 1700
Virginia Beach, Virginia  23462
757.499.8800 (telephone)
757.473.0395 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of May, 2010, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification

of such filing (NEF) to all counsel of record.

/s/___Andrew J. Huige_____
George H. Bowles, Esquire (VSB #38754)
gbowles@williamsmullen.com
Andrew J. Huige, Esquire (VSB #68260)
ahuige@williamsmullen.com
Counsel for COMMERCIAL METALS
COMPANY,
*d/b/a* CMC DALLAS TRADING
Williams Mullen
A Professional Corporation
222 Central Park Avenue, Suite 1700
Virginia Beach, Virginia  23462
757.499.8800 (telephone)
757.473.0395 (facsimile