IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



FILED
NOV - 9 2010
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

COMMERCIAL METALS COMPANY,
d/b/a CMC DALLAS TRADING

PLAINTIFF,

v.

CIVIL ACTION NO. 2:09CV451

COMPAÑIA ESPAÑOLA de
LAMINACIÓN S.L.,

DEFENDANT.

## OPINION

This matter is before the Court on a Motion to Dismiss for Lack of Jurisdiction and Insufficiency of Service of Process, Doc. 6, by Defendant Compañia Española de Laminación S.L. ("Celsa Barcelona"). The Court held a telephonic hearing on September 24, 2010, considered the evidence and arguments presented, and **DENIED** Celsa Barcelona's Motion to Dismiss. Doc. 47. The Court now sets forth its findings and legal conclusions consistent with that Order.

### I. FACTUAL BACKGROUND[1]

This case involves a contractual dispute arising from the importation of steel on a vessel that traveled from Barcelona, Spain to Norfolk, Virginia. The relevant facts, as alleged by CMC in its complaint and by the parties' briefs on the issue of jurisdiction, are set forth below. See Docs. 1, 9, 30, and 33.

---

[1] In this Opinion, the Court recites the facts most favorably to CMC for the limited purpose of deciding the present motion to dismiss. The facts recited are not factual findings that the parties may rely upon for any other issue in this proceeding. See also infra Part III setting forth the applicable legal standard of review.

## A. Nature of the Suit

Celsa Barcelona, a Spanish company and subsidiary of Barna Steel, S.A. ("Barna Steel"), is a manufacturer of steel and was the seller of the steel cargo that forms the basis of this suit. Celsa Barcelona engaged its sister company Barna Conshipping ("Barna") to charter and deliver approximately 15,000 metric tons of steel to various ports in the United States, including the port of Norfolk, Virginia, where it was to be offloaded at the expense of its purchaser, Commercial Metals Company ("CMC"), the Plaintiff. The shipping contract was made on a "CNFFO" basis, meaning that the risk of loss passed from Celsa Barcelona to CMC once the cargo was loaded on the vessel in presumably undamaged condition—whereupon the arrangements for discharging the cargo were the sole responsibility of CMC. CMC chose the final destination for the steel, and Norfolk was one of the ports selected. Barna executed a charter contract with non-party Oldendorff GmbH & Co., KG ("Oldendorff"), an ocean carrier and owner of the M/V SATURNUS vessel ("Vessel"). Pursuant to this agreement, Barna chartered Oldendorff's Vessel to transport the cargo for CMC.

CMC in turn opened an irrevocable letter of credit, in the amount of over $20,072,960.00 in favor of Celsa Barcelona from JPMorgan Chase Bank for payment of the cargo under the contract. In order to receive the letter of credit, the bank required Celsa Barcelona to present "clean" ocean bills of lading before any amount could be drawn upon the letter of credit. A clean ocean bill of lading is one reflecting no damage or defective condition of the goods or their packaging on board a vessel. The steel was damaged, however, during the loading aboard the Vessel in Barcelona, Spain. Celsa Barcelona's surveyor in Spain observed and documented the improper loading, stowage, and damage to the steel. Naviera Barcelonesa, S.A. ("Naviera"), who was the agent representing both the Vessel and Barna at the load port in Spain, was

ultimately responsible for issuing the clean bills of lading. CMC alleges that Naviera issued clean bills of lading in spite of the fact that the steel was damaged when it was loaded on the Vessel in Spain. More specifically, based on Celsa Barcelona's "interrelationship with Barna who was one of Naviera Barcelonesa, S.A.'s principals," Celsa Barcelona induced Naviera to issue fifteen (15) clean bills of lading, at which time Celsa Barcelona drew under CMC's letter of credit with the bank. Doc. 30 at 3; see also Doc. 1 ("Comp."), ¶¶ 35 and 38.

Oldendorff, during the voyage, conveyed to Barna that the bills of lading should not have been released by Naviera at the port in Spain and were therefore void. Oldendorff noted improper loading, stowage, and damage to the steel on the mate's receipts.[2] According to CMC, however, Celsa Barcelona similarly induced Oldendorff to issue clean bills of lading upon arrival in Norfolk. In particular, Celsa Barcelona caused or induced Barna to offer a letter of indemnity to Oldendorff or his agents by holding them harmless from and against any consequences for issuing the clean bills of lading. Mr. Marc Grau Manecebo ("Grau") testified that he, as a representative of Barna, authorized Carlos Castán ("Castán"), an employee of Celsa Barcelona, to sign the letter of indemnity on behalf of Barna. Castán is the Logistics and Planning Director for Celsa Barcelona—he does not work for Barna or Grau. Castán nevertheless signed the letter of indemnity on behalf of Barna in favor of Oldendorff on November 19, 2008, the day the Vessel arrived in Norfolk and one (1) day after Celsa Barcelona received full payment under all fifteen (15) bills of lading. After the Vessel's arrival, CMC refused to offload the steel because it was nonconforming and damaged.

---

[2] A mate's receipt is a document signed by an officer of a vessel evidencing receipt of a shipment aboard the vessel and the condition of the shipment.

3

### B. Relationship between Celsa Barcelona, Barna Conshipping, and Celsa Group

Francisco Rubiralta owns Barna Steel, S.A ("Barna Steel"). Barna Steel holds 100% of the outstanding capital stock of both Celsa Barcelona and Barna. Celsa Barcelona manufactures steel products, including steel bars and rods. Barna then ships the steel goods.

Celsa Barcelona is also a member of Celsa Group. Celsa Group is "a confederation of eight principal steel products companies, among which is Celsa [Barcelona]," and Celsa Group "was created for branding purposes for its member companies and is independent of Celsa [Barcelona]." Doc. 8, Ex. 2 ("Grau Dec."), ¶¶ 1, 5. Francisco Eloy Sanchez Medialdea ("Sanchez"), Celsa Barcelona's export manager, confirms that Celsa Group has "no corporate or any separate legal status." Id., Ex. 1 ("Sanchez Dec."), ¶ 3. Jaime Cano Ruiz ("Cano") adds that Celsa Group is only a trade name under which various steel companies, including Celsa Barcelona, operate. Doc. 30, Ex. 6 ("Cano Dec."), ¶ 10.

Barna is not a member of Celsa Group, but Grau testified that he is both the General Director of Barna and the Corporate Supply Chain Director for Celsa Group. Additionally, 95% of Barna's customers are members of Celsa Group, and Barna derives 40% of its business from Celsa Barcelona alone. Doc. 30, Ex. 2 ("Grau Dep.") at 39 and 249.

### II. PROCEDURAL HISTORY

On October 5, 2009, Celsa Barcelona filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5), alleging lack of personal jurisdiction and insufficient service of process. Docs. 6 and 8. Prior to the filing of a response brief by CMC, the Court stayed the matter, in large part because of a related and pending interlocutory appeal involving third-party, Barna.[3] On January 27, 2010, the Court issued an Order extending the stay for a

---

[3] Barna, who arranged for the ocean shipment of the steel cargo to CMC, Comp., ¶ 8, filed suit against CMC seeking to force the offload of the steel upon delivery. This Court dismissed Barna's admiralty claims for lack of

4

period of one-hundred eighty (180) days, or until the date of a Fourth Circuit ruling on the appeal. Doc. 16.

On March 30, 2010, the Court approved an Agreed Order modifying the stay to afford CMC an opportunity to effect alternative service of process on Celsa Barcelona, a key issue in Celsa Barcelona's original Motion to Dismiss, and to otherwise respond to the separate matter of personal jurisdiction. Doc. 22. CMC subsequently effected alternative service and submitted its brief in opposition. Doc. 30. Celsa Barcelona timely responded. Doc. 33. The Court held a telephonic hearing on September 24, 2010 and, ruling from the bench, **DENIED** Celsa Barcelona's motion. Doc. 47.

## III. STANDARD OF REVIEW

First, when a defendant files a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), challenging the court's personal jurisdiction, the question is one for the judge and the plaintiff, as the party invoking the court's jurisdiction bears the burden of establishing the necessary jurisdictional facts, *e.g.*, the existence of minimum contacts between the defendant and the forum state. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989); see also Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 59–60 (4th Cir. 1993). Where the jurisdictional facts are disputed, however, the court may either resolve the issue in a separate evidentiary hearing or defer ruling pending receipt at trial of evidence relevant to jurisdiction. Combs, 886 F.2d at 676. If the court rules on the basis of the motion papers alone, the plaintiff need only make a *prima facie* showing of a sufficient jurisdictional basis. Id. The Court, in deciding whether a plaintiff has met this burden, must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction. Id.;

---

jurisdiction and failure to state a claim, which Barna has appealed interlocutory to the Fourth Circuit Court of Appeals.

5

see also Wolf v. Richmond County Hosp. Auth., 745 F.2d 904, 908 (4th Cir. 1984). Here, the Court did not hold an evidentiary hearing, but instead heard oral argument on the motion papers; accordingly, the relevant standard is a *prima facie* showing of personal jurisdiction.

Second, Rule 12(b)(5) states that a defendant may be dismissed from an action for insufficiency of service of process. FED. R. CIV. P. 12(b)(5). Indeed, both the leading treatise on federal procedure and the Fourth Circuit have observed that the concepts of (1) subject matter jurisdiction; (2) personal jurisdiction; (3) venue; and (4) service of process "are intimately related and that all four requirements must be satisfied in every case. Thus, an action brought in the proper district for venue purposes cannot proceed unless valid service on the defendant is effected." 4 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1063 (3d ed. 2002); Norris v. Georgia, 522 F.2d 1006, 1014 n. 15 (4th Cir. 1975) (quoting Wright & Miller).

## IV. ANALYSIS

### A. Service of Process

CMC asserts that sufficient service has been effected in the following two ways: (1) Grau, acting as an agent for Celsa Barcelona, was properly served in Virginia; and (2) Celsa Barcelona was properly served a second time pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii). In response, Celsa Barcelona concedes service was effected pursuant to Rule 4(f)(2)(C)(ii), but disputes that service could be effected on Grau because Grau is not Celsa Barcelona's agent. Because Celsa Barcelona concedes service via Rule 4(f)(2)(C)(ii), its argument that CMC did not effect proper service is rendered **MOOT** and will not be addressed by the Court.

## B. Personal Jurisdiction

Celsa Barcelona argues that the claims against it must be dismissed because CMC has not alleged facts sufficient to establish personal jurisdiction. A plaintiff must establish at least a *prima facie* case of personal jurisdiction to succeed at this juncture, and CMC contends personal jurisdiction has been established for two primary reasons: (1) Virginia's long-arm statute applies and confers personal jurisdiction over Celsa Barcelona; and (2) Celsa Barcelona consented to this Court's jurisdiction through Barna's presence in the forum.

### i. *Whether personal jurisdiction is established by Virginia's Long-Arm Statute.*

Specific personal jurisdiction may be established over a non-resident defendant by looking to the state's long-arm statute. As the Fourth Circuit has recognized, an analysis of personal jurisdiction is a dual inquiry consisting of both statutory and constitutional components. Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 313 (4th Cir. 1982). This Court may only exercise personal jurisdiction over a non-resident defendant if such jurisdiction is authorized by Virginia's long-arm statute and such exercise of jurisdiction is consistent with the due process clause of the Fourteenth Amendment. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009) ("Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry.") (citations omitted).

Virginia's long-arm statute provides in pertinent part: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting any business in this Commonwealth . . . ." VA. CODE ANN. § 8.01-328.1(A)(1). In order to impute the activities of one entity to another the statute refers to action "by an agent." CMC maintains that Barna's conduct in the forum may be imputed to Celsa

7

Barcelona. This contention implies some degree of control over, knowledge of, and benefit from the actions of Barna and Grau by Celsa Barcelona.

One of the primary issues presented in the Motion to Dismiss is the role Grau plays. It is undisputed that Grau is the Corporate Supply Director for Celsa Group, as well as the General Director for Barna, and that Barna and Celsa Barcelona are sister companies, owned by Francisco Rubiralta's Barna Steel. CMC asserts that there is no real distinction between Celsa Barcelona and Celsa Group. Celsa Barcelona insists that Celsa, Celsa Group, and Barna all operate independently and in separate capacities. Celsa Barcelona underscores that Grau is neither employed by Celsa Barcelona nor authorized to receive service of process on behalf of Celsa Barcelona. Furthermore, Grau is not paid by Celsa Group. Rather, he is the unsalaried Corporate Supply Director for the group, and he is paid by Barna's parent company—Barna Steel.

To be sure, Celsa Barcelona concedes that Celsa Group is nothing more than a trade name or "brand" that operates through Celsa Barcelona, as well as several other steel manufacturers. Nevertheless, Celsa Barcelona also maintains that Grau has no affiliation with its business—for purposes of personal jurisdiction. But Grau's deposition testimony, which reveals his actual relationship with Celsa Barcelona's business, tells a different story. Grau's role in this matter started in Barcelona, Spain where he provided orders and instructions to the stevedores at the Spanish port:

> **Grau**: I ordered that the stevedores follow the captain's indications – and the supercargo.
> **Q**: Who did the stevedores work for?
> **Grau**: Celsa [Barcelona].
> **Q**: And they were listening to you why?
> **Grau**: Because they know that I am the corporate supply chain director [of Celsa Group].

8

Grau Dep. at 158.

Later, Grau instructed Castán, an employee of Celsa Barcelona, to sign the letter of indemnity on behalf of Barna in favor of Oldendorff. Curiously, Castán signed the letter of indemnity on behalf of *Barna*, even though Castán is not employed by Barna. Grau also remained in communication with Celsa Barcelona, demonstrating that Celsa Barcelona had knowledge of Grau's conduct while Grau was in Norfolk. In fact, Grau informed Celsa Barcelona about the letter of indemnity before authorizing Castán to sign it. See Grau Dep. at 412–13. And Celsa Barcelona offers no explanation as to why Grau had the authority to instruct Celsa Barcelona employees to perform certain tasks, or why Celsa Barcelona employees complied with Grau's orders. Additionally, because Celsa Group is simply a trade name and has no ascertainable distinction from Celsa Barcelona, Grau's role as Corporate Supply Director leads the Court to believe that Grau actually worked for Celsa Barcelona, implicitly or not, as an agent or employee.

Yet, for the Court to find personal jurisdiction here, Grau or Barna must have transacted business in this forum. And CMC has shown this by *prima facie* evidence. First, Grau traveled to Norfolk to oversee the offloading of the steel before any suit, or related suit, was filed. See Doc. 30 at 10–11. While in Norfolk, Grau did the following: (1) he telephoned CMC's Operations Supervisor regarding who was going to unload the Vessel; (2) he communicated with Oldendorff about the offloading of the cargo; (3) he ordered Castán, a Celsa Barcelona employee, to sign a letter of indemnity for Oldendorff on behalf of Barna; and (4) he communicated to Celsa Barcelona that Castán would sign the letter of indemnity. At bottom, Grau worked directly for Celsa Barcelona through his dual positions as General Director of

9

Barna and Corporate Supply Director of Celsa Group. His actions in the forum are undisputed and are therefore attributable to Celsa Barcelona for purposes of personal jurisdiction.

In addition to Grau's conduct on behalf of Celsa Barcelona, CMC argues that the Court can confer personal jurisdiction over Celsa Barcelona because Celsa Barcelona fraudulently induced Naviera and Oldendorff to issue clean bills of lading. CMC contends that these actions form the underlying basis of CMC's suit against Celsa Barcelona. If clean bills of lading were issued fraudulently, which the Court accepts as true for purposes of this motion, Celsa Barcelona's alleged tort continued from Spain to Virginia—where the Vessel was eventually docked. More importantly, it is undisputed that Grau, while in Norfolk, directed Castán to sign the letter of indemnity that induced Oldendorff to issue clean bills of lading. Grau Dep. at 369–70; see also Doc. 30 at 11 ("From Norfolk, Grau instructed a Celsa employee, Carlos Castán to sign the letter of indemnity that is at the heart of CMC's fraud claim."). Grau was thus in the forum state at the time of the alleged tort. See DeSantis v. Hafner Creations, Inc., 949 F. Supp. 419, 425–26 (E.D. Va. 1996) (noting that section 8.01-328.1(A)(3) "requires that an out-of-state defendant be physically present in Virginia when committing the act or omission giving rise to the tort at issue").

Inasmuch as Grau and Castán acted directly for the benefit of Celsa Barcelona in Virginia, the Court's inquiry does not end there. Celsa Barcelona must have sufficient "minimum contacts" with the Commonwealth of Virginia such that the exercise of jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations and internal quotations omitted). "Minimum contacts" are present if the defendant "purposefully directed his activities at the residents of the forum" and the plaintiff's cause of action "arise[s] out of" those activities.

10

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citations and internal quotations omitted). A single act by a defendant may be sufficient to satisfy the necessary "quality and nature" of such minimal contacts, although "casual" or "isolated" contacts are insufficient. Int'l Shoe, 326 U.S. at 317-18. "Because a sovereign's jurisdiction remains territorial, to justify the exercise of personal jurisdiction over a non-resident defendant, the defendant's contacts with the forum state must have been so substantial that 'they amount to a surrogate for presence and thus render the exercise of sovereignty just.' " Consulting Eng'rs Corp., 561 F.3d at 276-77 (quoting ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997)).

Based on an evaluation of the above evidence, the Court **FINDS** that the in-state actions of Grau—stemming from his conduct as Corporate Supply Director of Celsa Group and General Director of Barna—should be imputed to Celsa Barcelona in order to confer specific personal jurisdiction. The Court also **FINDS** that Celsa Barcelona purposefully directed its activity toward Virginia and should have "reasonably anticipate[d] being haled into court" here. Chung v. NANA Dev. Corp., 783 F.2d 1124, 1127 (4th Cir. 1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

   *ii. Other Arguments Provided by CMC*

CMC asserts several other arguments, many of which are meritless, attempting to demonstrate personal jurisdiction over Celsa Barcelona. Because the Court has already found that personal jurisdiction is not lacking, the Court will not address CMC's other contentions.

### V. CONCLUSION

For the reasons set forth herein, Celsa Barcelona's Motion to Dismiss the Complaint was **DENIED**.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

/s/
_____
Henry Coke Morgan, Jr.
Senior United States District Judge

_____
HENRY COKE MORGAN, JR
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

DATE: _November 8_, 2010